# John D. Casey, Administrator, Appellee, v. Chicago City Railway Company, Appellant.

## Gen. No. 16,037.

1.  MASTER AND SERVANT—*what risk not assumed.*  *Held*, in this case, that there was no evidence that the work of the plaintiff's intestate required any particular knowledge of electricity or that such intestate had such knowledge and it was a question of fact to be determined by the jury whether such intestate knew and appreciated the danger which resulted in his death and that the verdict of the jury upon that question should not be disturbed.

2.  NEGLIGENCE—*care required in use of electricity.*  One employing

a dangerous agency such as electricity is required to exercise a degree of care commensurate with such danger.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the HON. HOMER ABBOTT, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed April 1, 1912.

EDWARD C. HIGGINS and WATSON J. FERRY, for appellant.

OSSIAN CAMERON and RICHARD J. FINN, for appellee.

MR. JUSTICE SMITH delivered the opinion of the court.

The appellee, hereinafter called plaintiff, obtained a judgment against the appellant, hereinafter called defendant, for the sum of $1800 damages for the death of John Kolb.

The decedent had been employed by the defendant for several years as a boiler washer, or cleaner, at its power plant at Dearborn and 21st streets, Chicago. In its said plant were seven boilers, side by side, numbered one to seven, each bricked in and each about twenty feet long and ten feet wide. On the rear end of each boiler was a cleaning chamber extending across the entire width of the boiler and about three feet deep and eight feet high, the sides and back wall of which were brick. On each side of these cleaning chambers, about fifteen inches above the floor, was a small door about two by three feet. Between the rear of the boilers and the partition separating the boiler room from the engine room was an open space about ten feet wide. In this open space suspended from the ceiling were clusters of what is termed in the evidence Edison standard incandescent sockets and lamps, each cluster containing five lamps. One cluster was near the rear end of boiler number seven where the accident occurred. Each cluster carried from five hundred to five hundred and fifty volts of electricity, dis-

tributing one hundred to one hundred and ten volts to each lamp.

In washing the boilers the water was forced through a hose into the front end, and the boiler being slightly lower at the rear than at the front, the water flowed through the boiler and out at the rear end into the cleaning chamber, from which it ran off through a hole near the bottom of the chamber. In this work water and mud would accumulate in the bottom of the cleaning chamber. If more light was required in working around the rear end of a boiler, the workman took what was termed an extension cord, with a plug on one end and a keyless socket and lamp on the other, detached a lamp from the cluster, screwed the plug at the end of the cord into the socket of the detached lamp and hung the lamp at the end of the cord on spikes driven into the brick walls for that purpose. The system of electricity in use was what was termed a grounded system. If a person took an extension cord into the cleaning chamber with water and mud in it, the current was liable to ground and the person holding the cord or socket with the electricity on would receive a shock.

The decedent was found dead in the cleaning chamber back of boiler seven. No one saw him enter. He was lying on his back across two blow-off pipes, four to six inches in diameter, that passed from the boiler through the chamber about a foot from the ground, with an extension cord under his arm and extending along his body, and badly burned under the arm. A part of the insulation of the extension cord was burned off and at the same point either the feed or return wire was also burned off. The lamps on the cluster to which the extension cord was attached were not lighted. The water in the cleaning chamber was about three inches deep. The evidence is convincing that an electric shock caused the death of decedent.

The defendant urges that it was not guilty of any

negligence charged in the many counts of the declaration; but that if guilty of any negligence so charged, the decedent assumed the risk, for the conditions of the surroundings, the boilers, appliances and all the methods of doing the work and the dangers thereof, were obvious, apparent and understood by the decedent, who was fifty years of age, of ordinary intelligence and so employed for about eight years, and that the death of the decedent was caused by his own negligence.

The testimony was that if a person handling the extension cord received a shock from it while carrying the usual one hundred to one hundred and ten volts, he might be burned some but not fatally injured, and this danger we think from the evidence the decedent knew and appreciated. If, however, according to the testimony, an accident happened to the cluster of lamps, or any one of them, such as the breaking of the small carbon filament of one lamp, whereby the current was interrupted and could not light one or more of the lamps, all the lights of that cluster would go out, and if at such time the extension cord was being used, it would receive the entire five hundred to five hundred and fifty volts, and as it would only carry safely about two hundred and fifty volts, there was great danger in its use, and if at such time a person had a hold on the cord or socket and in a position to ground the current, he would probably be killed.

Even the defendant's foreman over the decedent did not seem to know and appreciate the situation. He was an engineer and somewhat of an electrician, and in answer to the question, referring to the five hundred to five hundred and fifty voltage, "How would he get that voltage into that lamp?" answered, "Well, I don't know. I can't explain that, but he certainly got enough to kill him." This witness also testified: "I merely warned him not to use that light in there. I told him it was a dangerous thing to handle a wire in a wet place." The testimony was that the connections in

the cluster were covered by a hood and only an expert could trace the current; also there was no fuse to break the current if anything happened causing the entire voltage to be turned into the extension cord. There is, however, no claim that the defendant did not know and understand the situation and the danger thereof. There was testimony that the defendant furnished candles to be used for lighting purposes inside the boilers and the cleaning chambers while being cleaned, and that candles or torches were so used and not the extension cord. On the other hand there was testimony that the candles would blow out and torches would smoke, so that neither could be used, and the extension cord was so used, especially in the cleaning chamber.

We think that the testimony may be fairly considered to show that the decedent knew and appreciated that the usual current on the extension cord, which was one hundred to one hundred and ten volts, might shock and burn him, but the controlling question in the case is: Did he know and appreciate that he might in using the extension cord in the manner he did, under all the circumstances in evidence, receive a shock from the current five times greater than the usual voltage, which would probably kill him? If he did know and appreciate the same, the defendant is not liable. If he did not, or, as an ordinarily prudent man, under all the circumstances, in the exercise of ordinary care, would not have so known and appreciated said danger, then it would seem that it was the duty of the defendant to so warn the decedent, or by a fuse protect the said cord from the entire current passing into it.

The evidence was that the decedent was a careful man, and as a common laborer it seems he had no occasion to use or know anything about electricity except as he used the extension cord for the purpose of obtaining better light in his work about the boiler.

There was no evidence that his work required any particular knowledge of electricity or that he had such knowledge. Electricity is a silent, powerful and deadly force. As was said in Commonwealth Electric Co. v. Melville, 210 Ill. p. 70: "As there is greater danger and hazard in the use of electricity, there must be a corresponding exercise of skill and attention for the purpose of avoiding injury to another to constitute what the law terms 'ordinary care'. The care must be commensurate with the danger." It was practically admitted there was no fuse or device protecting the extension cord from receiving, in case of certain accidents, the full voltage of electricity carried. Whether the decedent knew and appreciated the danger must be determined by a consideration of the testimony pertaining to the warnings it was claimed were given the decedent and many other circumstances in evidence. The case presents a nice distinction on the facts and is by no means free from doubt; and under such circumstances it is our duty to abide by the verdict of the jury.

We think the damages are not excessive under the evidence, and that the refusal of the Court to give the instruction complained of was proper.

The judgment is affirmed.

*Affirmed.*